and will the lawyers on People v. Thomas approach please and tell us who you are and who you represent? Good morning, Your Honors. Assistant State's Attorney Alan Spellberg representing the appellants in this matter, the people of the State of Illinois. Good morning, Your Honors. Assistant Public Defender Eileen Paul on behalf of the appellee Marquis Thomas. All right. And Mr. Spellberg, how much time would you like this morning? Fifteen minutes, Your Honor. All right. And Ms. Paul? Fifteen to twenty, depending on what is raised in the other array. All right. Okay. And whenever you're ready. Good morning again. The case before the court today involves the granting of a motion to quash arrests and suppress evidence by the circuit court. The people maintain that the court's ruling is erroneous both factually and legally. And the expectation of privacy that the defendant had was against the manifest way of the evidence. Legally, in the sense that there was no Fourth Amendment violation that resulted in any collection of evidence, and no evidence that resulted from the arrest is available to be used against the defendant. Who had the burden to prove the reasonable expectation of privacy in the premises? It would be the defendant, Your Honor. The Illinois Supreme Court has made it very clear that the burden of proof retains with the defendant throughout the entirety of a motion to quash arrests and suppress evidence. Included in that is the threshold question of expectation of privacy, in that the defendant must establish that he has an expectation of privacy which has been recognized as reasonable by society before he can challenge an entry by the police into that area or a search of those premises. And that didn't happen here. In fact, the trial court at the, during the arguments on the motion itself, after it had denied the people's motion for a directed finding, but in the arguments over the, whether or not that should be granted, the trial court specifically stated, and you can find this on page 25 of the record, the trial court specifically stated that there has been no evidence showing that the defendant has any expectation of privacy in the apartment building. So in your view, is that the end of the inquiry? If he has no reasonable expectation of privacy in the premises, are we done? Your Honor, that's, I believe that that answers the question as to whether or not the gun was lawfully recovered and whether or not the defendant can move to suppress the gun, which was lawfully recovered. And the reason why I answer your question specifically about the gun is because in this case, the firearm was recovered before the defendant was arrested. As I'm sure you remember from the facts of the case, the police officer, as he was driving along, saw a group of individuals standing outside the apartment building. They were in an unmarked car, but they were driving along. They were driving slowly. And as they were driving, they noticed two individuals immediately turn and go into the building. That was suspicious, according to the police officers. And they followed them into the building through the unlocked door. And as they're going up the stairs of this multi-unit apartment building, they see the defendant, Marquis Thomas, hand the gun to the co-defendant, a juvenile. Where specifically were they then? Was that in a, quote, common area? Was it somebody's apartment? Your Honor, it's very clear that they were in the common area of the building. They had entered through the main entrance to the multi-unit apartment building into the vestibule area and were going up the stairs, which go up between the different apartment buildings. And sorry for the interruption, but what about this whole curtilage argument? And then, you know, they're referring us to dog sniffing, drug sniffing dog cases. Your Honor, absolutely there is an ongoing question as to where the curtilage line applies for purposes of a multi-unit apartment building. The problem with that argument here is that it's a distraction. It's a red herring in this case, because the only way a defendant can claim Fourth Amendment protection within the curtilage is if he can establish that he has an expectation of privacy in the building itself, in the property itself. And that's why I started off this argument by pointing out that the evidence in this case is completely devoid of any aspect of an expectation of privacy of the defendant. It was effectively admitted below that the defendant lived elsewhere and that it was a girlfriend's apartment, or at least potentially a girlfriend's apartment, I should say. Yeah. Was that actually established? No, I would say not. The extent of the evidence regarding the girlfriend is on a single question asked by defense counsel at the time. When she went to the apartment, who answered the door? A woman. I believe it may have been defendant's girlfriend. That's the extent of it. There's no further development of that aspect. There's no proof the defendant has stayed there repeatedly or overnight in any way. No other connection of the defendant to that apartment or to the apartment building. And I stress, as I stated before, that it is the defendant's burden to establish his expectation of privacy. So I think the defendant takes the position that the police couldn't even get in the front door of the building, that all we have here is a car, unmarked police car, driving slowly down the street. They see a group of people in front of the building. Two of those people, according to Officer Caribou, flee into the building. The defendant says that's not enough to get the officers in the building. Why is it? Well, Your Honor, first off, again, the defendant can only complain about the entry into the building if he has an expectation of privacy. As the Supreme Court has said, that is the threshold question. If he can't satisfy that, the motion must be denied. But even assuming that, Your Honor, I believe that there is sufficient basis. What the U.S. Supreme Court held in Wardlaw is that flight from a readily identifiable police officer is in itself suspicious and can authorize a Terry stab. But the key in this case is that there wasn't a Terry stab at that point. Because, yes, the defendant, the police officer fled, followed the defendant into the building. He didn't stab the defendant until after he had made it into the apartment. And what we know very clear from the Fourth Amendment is that unless and until you are actually stopped, until your movement is impeded by the police officers, there is no Fourth Amendment event at that point. So following them into the building, there is no threshold expectation of privacy. But even if there were once they're inside, there's still no stop until after they see a gun being transferred from the And so at that point, absolutely, there is an expectation, a reasonable, articulable suspicion and more so even probable cause for arrest of the defendant because they see him with a gun out, not being concealed. Let's talk for a moment since you're there factually about the issue of abandonment. What's your position? So the law of abandonment is that if you abandon property, you no longer have a Fourth Amendment expectation of privacy and you no longer have an interest in it. The state can recover it. The police can recover it without any Fourth Amendment event occurring. In this case, factually, the defendant clearly did hand off the gun to the juvenile who then threw it on the ground. So the gun was abandoned by either the defendant or more even more significantly by the co-defendant, by the juvenile. And when the police see a gun on the floor sitting there, they are certainly entitled to recover it. And the reason why we know it was abandoned by that juvenile is because he dropped it and ran away. That's classic abandonment. Every case. The examples that the counsel raises in the brief involving where an individual hands a sealed briefcase to another individual for safekeeping, the courts say that's not abandonment. The reason why that's not abandonment is because there's an expectation that it's going to retain control and reobtain control over that item. There was nothing like that here. The juvenile, at a minimum, was discarding the gun in hopes of not being caught with it, in hopes of not being held culpable for it. So as I stated, the trial court's ruling here is against the manifest way of the evidence because the evidence is very clear that the defendant has not met his burden at all of establishing an expectation of privacy. The evidence is very clear that the firearm, the gun, was recovered before any arrest of the defendant. And the evidence is very clear that the probable cause for the defendant's arrest developed as soon as the police officer saw the defendant hand the gun to the juvenile, and then the police officer recovers a loaded firearm. Well, Mr. Thomas invokes the exception in the Concealed Carry Act for someone who is an invitee on premises with the knowledge and consent of the owner. And would that extend to the common areas? Your Honor, it could possibly extend to the common areas, but the notion of the invitee, the old national court has made this clear, is that that's not an element of the offense that has to be proven. That is an exemption which the defendant would have to prove at trial. So how is it that a fact that has to be proven at trial by the defense now turns into a factor that the police officer must disprove in order to even have the lesser standard of probable cause? It doesn't make sense the way the system is set up. But even more importantly, probable cause is a common sense totality of the circumstances scenario. In looking at the circumstances of this encounter with the police officer, a defendant who is running because he has a gun, running from a police officer because he has a gun, and then immediately tries to hand it to another person, a juvenile, is not an indication of lawful possession or inviting possession. Instead, it is an indication under a common sense concept of unlawful possession.  I understand that there's a lot of case law out there involving post-Aguilar. Is it lawful? Is it legal to do that? But what the case law fails to recognize is the totality of the circumstances. How is the gun being possessed? What is the individual doing with the gun at the moment that the police officers have encountered that? The reason why we have that provision in the Concealed Carry Act is to allow the law-abiding citizens to ensure that they inform the police officer that they are lawfully holding it, so that way there is no misunderstanding and no mistake about what's going on. It isn't intended to provide cover and assistance to those individuals who are not lawfully holding it and are just starting it in a way that would be violation of every other aspect of the law. Would it have been different if instead of handing off the gun, Mr. Thomas went into the apartment, locked the door, took the gun with him? It could have been different, Your Honor, absolutely. Because at that point, the police officer would not have seen the gun, so it certainly wouldn't have probable cause at the moment that he went up to the apartment door. That would absolutely be inappropriate. There is, as I stated, a serious question as to the ability of the police officer to go to that apartment because it hasn't been established the defendant has an expectation of privacy. But assuming he does actually have an expectation of privacy in the apartment, then yes, that would probably not allow for him to go there, not having seen the gun because it wouldn't have rise to probable cause. But that also raises a very important point that the court also ignored, ultimately at the third or fourth court date. This is an unusual motion to quash arrest and express evidence because the judge keeps deciding to take it under advisement and making small little portions of findings. But the ultimate portion, the ultimate finding, was that because the arrest was without probable cause, because the police officer couldn't rely on seeing a gun, since some people may be able to lawfully possess a gun, since their arrest, according to the judge, was without probable cause, then everything related to it would be suppressed, even though the gun was recovered independently of the arrest of the defendant and before the arrest of the defendant. And that's a very important point because what the case law has shown, the exclusionary rule has always been limited to those pieces of evidence that are resulting from the fruit of the poisonous tree. This would be the fruit of the unplanted tree. Yes, Your Honor. That would be correct. And so there's no basis here to suppress the gun at all because the gun was recovered independently of the arrest. The arrest occurred after the fact. Now, whether or not the police officer had the authority to go into the department and arrest the defendant, I can't answer that question, but it doesn't matter because what the case law has said, in particular, the Hansen case and the Cora case that we cite in our brief, in our reply brief in particular, make it clear that even where a defendant is arrested without probable cause at the time, where the arrest itself at that time is unlawful, if no evidence is recovered as a result of that arrest, there's nothing to suppress because you cannot actually quash the arrest. You cannot dismiss the charge simply because there was a Fourth Amendment violation. And that is, at most, what happened here. At the absolute most, the taking of the defendant into physical custody in that apartment, dragging him out of the apartment is what the police officer said. At most, that's a Fourth Amendment violation. But there absolutely was probable cause for his arrest because they saw the gun and they saw it under circumstances that indicated unlawful possession. And so for that reason, since there's no evidence which derives from the putatively unlawful arrest, there's no basis for the trial court's motion suppressing the evidence. And for that reason, we ask this Court to reverse the trial court's ruling and remand the matter for further proceedings. Thank you. Ms. Paul. Good morning, Your Honors. This Court should affirm the grant of the motion to suppress where the police officer here observed no conduct which could have given rise to a reasonable belief  Well, what about Wardlaw? Wardlaw says if you're in a high-crime neighborhood and you see the police and run away, nothing unlawful about that, but that's enough to justify a Terry stop. Your Honor, Mr. Wardlaw, whom I argued in this very courthouse way back when, Mr. Wardlaw ran in a gangway. Here, that is not what happened. Mr. Thomas went back into a residential apartment building. Retreat into your home, which in Florida v. Hardinas, is listed as one of the important concerns of the Fourth Amendment. Here, at best, is a retreat into a residential building. That is not flight. And in addition, this is a probable cause. You need more than simply a reasonable suspicion. But on the Terry stop issue, there was simply not enough. This car was also, as the officer testified, that the men turned to go back into the building when the car was still down the block, is the phrase that the officer used. That is not, and it was an unmarked car and an officer in plain clothes, but for an insignia on his shirt. Ask yourself how they would have known this was a police car from down the block. Everybody sees those M license plates, right? Your Honor, there's no testimony about that. Again, all we have in the record is that this was an unmarked police car. It was down the block. It was an officer in plain clothes with the only designation that's referred to in the record clearly would not have been visible inside of a car down the block. And here again, this was not a run down the gangway as Mr. Wardlow did. This was a walk into a building. It's a run into a building that he doesn't live in. So where does he derive the expectation of privacy? What is it about that apartment building and all the people who live in that apartment building that gives this young man the right to have an expectation of privacy when he's running from the site? The law recognizes that a house guest may, under certain circumstances, have private Fourth Amendment rights to be asserted. Show us from the record where it was that the defendant proved during one of these hearings on the motion to suppress that he was an invitee, that his girlfriend was. During the motion, the officer testified that the girlfriend let him into the apartment. The State presented no evidence here to contest anything about his relationship with the girlfriend. They don't have the burden of proof. The defendant does. Yes, but what happened in this case was... What was the girlfriend's name? How long did she live there? The burden of proof is shifting. And here what happened was the defendant made a prima facie case. The State contested that. There was argument upon it, and the trial court decided you've met your prima facie burden by showing evidence that you were able to enter the building itself, evidence that you were able, quick and ready, access to the apartment. You were able to let yourself in. You could lock the door behind you. It was in the evening, not a time of day. And after that ruling was made, the burden shifted. At that point, it was not the defendant's burden to produce more evidence. The expectation of privacy here is a pretty fundamental pillar of what your entire argument is based on, right? Yes. Hang in there with me. Sorry to intrude, but it's based upon the police officer's testimony that I think it was his girlfriend or something to that effect, right? You're leaning on a pretty slender reed there. That doesn't seem like a strong pillar to me. Again, if there was any dispute about whether this was his girlfriend, where was the witness? The State could have called that girlfriend to the witness stand and interrogated her about the relationship. They did not do that. The burden had shifted to them. And the fact they did not ---- He wasn't in her ---- let's say it was his girlfriend of many years. He wasn't in her apartment when he handed off the gun to his cohort, was he? He was inside the building in which her apartment was located. In the common area. In the common area. And under Florida v. Hardinas, you can consider the curtilage. And your Fourth Amendment rights extend to areas outside your home, areas where you generally, under our social norms, would be considered areas where you don't expect strangers to intrude or trespass unless they have a license to enter. Well, if you live on the second floor and the police observe you on the first floor handing off a gun to somebody, is that part of the curtilage of your second-floor apartment? Under the case law, the consideration is, is it the general daily experience in the City of Chicago that police officers have a license to roam at will throughout the hallways of private residential apartment buildings? They're not roaming. They're going after people who are running from them. How do you call that roaming? There was no testimony of running. The police officer used the conclusory term, flee, but never testified that the men went inside at any advanced rate of speed or that they ran. I mean, the dictionary definition of flee is to run away. Can't we rely on that when he says that? This officer observed these men standing immediately outside the door to an apartment building in a very brief period of time, a few steps into the building. Again, there was no testimony to really support or flesh that out. If there's somebody fleeing the police, as soon as that person gets inside the door of any apartment building, he's over. Unlocked apartment building. Unlocked apartment building. Police might not even follow him in. The police did not have reasonable suspicion that any of the men who simply turned around and went back into a private residential apartment building were committing any crime. And having no reasonable suspicion to enter the building, they also had no probable cause that anything they observed inside the building was a crime. As we pointed out, the Concealed Carry Act does allow people to display firearms inside a building. The fact that Thomas was able to walk into a residential apartment building and then the officer observed him go into an apartment unit in that building clearly should give rise to a reasonable belief that he was either a resident or an invitee of a resident. But if he handed the gun off before going into the apartment and locking the door, doesn't that change the equation? Doesn't that give rise to a reasonable suspicion on the officer's part that he didn't have the right to have that gun? There is no support for that, Your Honor. It's simply the right to display your guns does include your, again, it involves invitees. But it doesn't involve the right to hand it off to somebody else. There's no basis for assuming that the other person did not have an FOID license either. That is the key point here. There was no information known to the officers until after they got to a police station that Thomas did not have an FOID license. There's nothing they observed inside that apartment building that would have given rise to any belief that they were doing any conduct outside of the Concealed Carry Act, which does allow people to display and handle firearms within their own homes, within their own buildings. This wasn't his building. He had a connection sufficient to raise the Fourth Amendment. He was there at his girlfriend's apartment. You said earlier that the State should have brought her in as a witness. What stopped the defendant from bringing her in as a witness and saying, yeah, I invited him over for dinner? What stopped the defendant with a favorable ruling on the prima facie case, the denial of the State's directed finding, and the fact that the State rested without calling any other witnesses? There's a difference between a prima facie case, which requires the introduction of some evidence. Yes. And ultimately sustaining the burden of proof, which was the defendant's to show that he had a reasonable expectation of privacy in this building. So all we know, based on the record, is that Officer Caribou thought it was his girlfriend who opened the door. How does that establish the defendant's expectations? Well, under the law, when a party has a burden of production, which the State had shifted to it after the prima facie case was met, under the law, the trial court may draw a reasonable inference, an adverse inference, from the failure to present a witness. So the conclusion from the absence of the girlfriend as a witness here, the conclusion is not that the witness would have been unfavorable to the defendant in the procedural posture of this case, a prima facie burden, a finding having been made, the State resting without putting on a witness. The inference is adverse to the State. Of course, the trial court's finding that Mr. Thomas had made out a prima facie case doesn't preclude us from determining the opposite, right? Your Honor, yes. Under the – with the proper standard of review to be given deference to the fact of deference, although the ultimate question on the motion to suppress is de novo. Right. But with respect to the factual pieces here, that is part of the mixed standard of review, that you should defer to the trial court. The trial court heard the witnesses, saw them, and again, in addition to the facts that were presented in the prima facie case, the trial court could properly rely on that adverse inference from the State's failure to present any additional evidence or witnesses. So it's prima facie plus an adverse. I didn't – if I missed it. We argued in general they failed to make their burden of proof that it had shifted to them, and we also argued that they had waived their right in this court to make arguments about the lack of evidence where they had every opportunity to put it on themselves. So that would be included in those arguments. So under that, the trial court did, with proper deference, and including that inference that arose when the State failed to put on any additional witnesses, the defense did not need to rebut a ghost. They needed to have something there to rebut. The State deprived the defendant of his opportunity to present proper rebuttal. Had the State, in fact, put on any evidence, they could have examined the officer further about whether he observed any of the defendant's clothing in the apartment. There was no questions about anything like that. Had the State even attempted to make their case and meet their burden, the defendant would have had the opportunity then to have brought in rebuttal. Isn't the State's – it's a burden of production. It's not a burden of persuasion. So when the State shows that the defendant lived elsewhere, even if we assume this was his girlfriend's apartment, isn't that enough? It is not, under the laws of totality of the circumstances. I would point to, beside NRB, people versus Pittman. There are multiple factors. They listed six to examine when determining whether a person had a sufficient connection to the premises. And a person may not show all of the factors. They just need to show some of the factors. No particular factor is more important than any of the others, according to the case law. And Johnson lays that out. The Illinois Supreme Court decision in Johnson lays that out and says clearly, it's the defendant's burden to show those factors. And the defendant here did show them. Withstanding the trial court's finding that Officer Caribou's testimony that, I think it was his girlfriend who answered the door, how did the defendant meet his burden under Johnson? He did make a showing of some of those factors. He showed that he was legitimately present. He showed that the girlfriend showed a prior relationship. He did have the ability to exclude others. He went into that apartment and he closed and locked the door behind himself. The girlfriend was in the apartment. She didn't kick him out. She was there at the time. He had ready access. He did not knock. There was no testimony that he knocked on the door, waited for her to open the door for him. He let himself in very quickly, according to the officer. It was also 7.30 p.m. at the time this happened. That is a time of day that typically a stranger would not be entering an apartment. That also indicates a level of connection to the premises. And, again, then there was the adverse inference from the State's failure to present evidence. Those put together, that was enough to sustain his burden under a deferential review. And, again, if there's any lack of – if there's further facts that could have been put in the record, the inference arising from the lack of those facts goes against the State and not against Thomas because, again, he did not have his opportunity to rebut. That is a waiver by the State, the waiver of their right to make that argument here before the court because it is sandbagging. And to hold here that somehow where the State never mentioned any of this below and never gave the opportunity and sat down and rested, that somehow these should go against you in the appellate court. It's depriving him of his opportunity to have rebutted at trial. So your argument is that although he had the burden to prove the expectation of privacy, the fact that the State entered into evidence observations by the police officer is enough. On this record, it was enough to show a connection to the apartment where he presented evidence on some of the factors and where the State did not contest those factors. The expectation of privacy would be that he lived there or he was an invitee. And there's nothing in the record that I can see that shows that he lived there. Certainly, there's nothing that shows that he lived there. And there's nothing that shows that he was an invitee. There is something that shows that he walked into some girl's apartment. We don't know if it was his girlfriend or just some girl that he knew or some relative. We have no idea. Why isn't that his problem? It's because of that directed finding ruling where the State did not make those arguments that Your Honor is making. The State did not come in and say and contest that when the burden shifted to them. Again, had the State done so, the defendant could easily have had the opportunity to present rebuttal evidence. So you're saying that a burden of proof is okay if you wait until rebuttal to deal with it? We're saying that he met his burden of proof. You can wait until after the State does something and then rebut that that establishes your burden of proof instead of saying, you know what, we're going to go ahead and deal with this burden of proof right at the top. He met his burden of proof. The trial court found that he met his initial burden of proof on the issue. When that happens, at that point, again, the burden of production shifted to the State. If there were further evidence that the State now wants to argue should have been presented, where was the State in the trial court? Where was the State's attorney standing up and saying that? Where was the State's attorney calling a witness or recalling the officer to examine him further on what he observed? Had that happened, the defendant could have had the opportunity to rebut it. The State is the one who is trying to game the system here by waiting to raise these arguments on appeal that it never voiced in the trial court. And again, the party who makes the burden and then has the other side sit down and do nothing, that is the situation we're in here. And under Stigall, and we've cited all the waiver cases, waiver applies to the State as well as to the defendant. When the State simply didn't put on evidence and didn't examine these questions further, it can't wait until this panel and say, where's the girlfriend, where's the other evidence? And those witnesses clearly were within the State's ability to subpoena as well. I'm still having trouble with that. Typically a burden of proof is somebody's, and they accept it at the beginning, and they try to prove their point. And that's the Oh, it's okay for us to just wait until later. No, I'm not saying that at all, Your Honor. I'm saying that here the burden was met. There was proof on some of the factors. They did show a relationship to this building and to a unit in the building and to a person in that building. If there's any, all these questions about, oh, you could have put on more, you could have put on more, you could have put on more. Well, the State was the one who had the opportunity to raise those questions below and did not do so. And again, the fact that the State sat down and rested its case after its directed finding was denied, that's what puts this case into the waiver category. If there's any silence on the record here, it does not go to the defendant's burden. It goes to the State here. What about Mr. Spellberg's argument that there was no search here? The defendant handed off the gun to his co-defendant, who then threw it on the floor and ran away. Where's the search? Here, Your Honor, with respect to the abandonment issue, the case law is clear that it's not an abandonment. I'm really not talking about abandonment. Where is the Fourth Amendment implicated when the gun is thrown on the floor in the hallway? The testimony here was that the officer said, I probably said freeze to the man. That happened before the gun was dropped on the floor. And neither one of them froze. Yes, but that would be a seizure. But neither one of them froze. They didn't stop. The defendant ran into the apartment. The other person threw the gun down and ran away. Yes, here it was, they were on the crillage. As the case law says, I believe the recent case we cited in our motion to cite additional authority, Collins said that the Fourth Amendment interest isn't solely in the item. It's also in the curtilage itself. So, again, the intrusion, the trespass. They were intruding upon the curtilage of this apartment. That intrusion happened at the moment that officer opened the door and walked into the building. And that is where the Fourth Amendment kicks in. Unlocked building. Excuse me, I didn't. Unlocked building. It was an unlocked building, Your Honor. Anybody from the public could have walked in. That question was addressed by the Illinois Supreme Court in Pupil v. Bonilla, where they said for Fourth Amendment purposes, there was no distinction between a locked and an unlocked door. This is the common area of an unlocked building. It's not the threshold of her door. It's the stairwell and the landing around the stairwell. Yes, and under Pupil v. Hardinas, the court is, you may assert a property interest. It's a distinct test from the privacy test, which had been previously used. It would be true if it were his property. It might be true if it were his property.  And then the question would be whether or not the argument about his property extends to the stairwell and the landing of an unlocked door, common area building. Yes, Your Honor, and that second question is answered by Florida v. Hardinas, as applied most recently in Pupil v. Bonilla. In that case, we do not use the previous test, which the state relied upon in its brief, United States v. Dunn. Now the test is Florida v. Hardinas and the recent case, Collins v. Virginia, that the focus is now on whether you have the daily experience shows that this is a space that you would feel it to be an intrusion and whether there's an implied license. But talk about, I mean, those cases talk about a defendant who's inside and the police are doing something in the curvilege of the residents. Is there any case that says if a defendant takes a bag of drugs and throws it down right in front of his front door, the police are powerless to do anything? The question would be, was the police officer in a position where the police officer had an implied license? You see Collins v. Virginia where the person parked the motorcycle next to the house and it was only partially covered by a tarp. Clearly the officer in that case saw quite visibly what they believed to be an item connected to a crime, yet the court held that the fact that the officer stepped off the, what was an implied license to knock on the street door of a single family home, the fact that the officer stepped off of that very narrow implied license to go lift the tarp and look at the motorcycle was in fact a search that was prohibited by the Fourth Amendment. It was presumptively unreasonable without a warrant. So under Collins, if the police officer observed a drop of a bag of drugs and it was in a spot where the officer had no implied license to be, was outside of the very limited scope that you might allow a person to come up to, to walk onto your curtilage, then in fact it would be presumptively unreasonable without a warrant. Assuming there were no other, you know, exigencies or other exceptions, it would be presumptively unreasonable, and that is what Collins v. Virginia says. Let me ask you about curtilage, because you bring it up, it's all over your briefs, it's all over your argument here, and I understand that that's your argument, that where he handed off the gun to the juvenile was curtilage or curtilized, whatever. Did the trial court ever make such a factual finding in the record, or is that just your distillation of it? The trial court did not use the word curtilage. It did find that that was a space that was protected by the Fourth Amendment, and it was subsumed in its ruling as far as that goes. And again, under the law, there are two. So the defendant would have no burden to prove the curtilage, the court doesn't have to find the curtilage, but you can argue the curtilage on appeal. We would argue that it was subsumed in the trial court's ruling, was necessarily a finding that the place in which this happened was protected by the Fourth Amendment. And, of course, there are two ways it could be protected by the Fourth Amendment. One would be the reasonable expectation of privacy, which would be governed by the done factors, and the second is the People v. Hardiness-Collins line of case, which does not use the done test anymore, which has been clarified by Collins, and now focuses on the social norms, the idea of intrusion, and that question of whether there was an implied license. And here it was entirely reasonable and not against the manifest weight of the evidence for the trial court to conclude that a private residential building, the interior of that building was not a space that our customary norms would consider open for a police officer to wander around for the purpose of gathering evidence. But it's okay to be handing guns off. Under our concealed carry law, it is considered a space in which people can exercise their Second Amendment right to firearms. It is not a space such as this building here today when I walked in and saw the sign on the door. It is not a space such as this, which is considered a special space where people are not allowed to use firearms. You keep saying the officer was wandering around. In fact, he was not wandering around. He was pursuing someone who was fleeing from him. Again, he did not have reasonable suspicions of any crime simply because a person goes into a building. Even Wardlow, again, did not say that. There was a showing of a high crime area. And again, Wardlow ran through the gangway to the back alley. He did not go into a house. Under these facts, simply because someone turned around at seeing a car half a block away and went into a house does not show that there's reasonable suspicion. I would also note that the Concealed Carry Act has a provision regarding terry stops, and it does specifically say that in the course of a terry stop, the license holder must, upon request of the officer, disclose or show their license. And had the officer here been truly conducting a terry stop, had he had reason to conduct a terry stop, he could have asked that question. He did not ask any questions of these men about, do you have a license? There was none of that. This was not a... At this point, the gun wasn't in the defendant's hands. He had not only handed it off to a colleague, the colleague had dropped it. He had no connection at that point to the defendant in terms of a terry stop. But if there was, if the argument is that this was suspicion of a crime, the only crime this could be would be, once you're inside an apartment building, a space which is under the Concealed Carry Act where you are allowed to have your firearm, the only way in which this behavior could be criminal would be if the officer had knowledge that the person did not have a license. Had the officer made the inquiry, which is allowed under the Concealed Carry Act in connection with the terry stop, if that had happened, clearly the officer could have placed Thomas under arrest. There was no inquiry here. There was no other information known to that officer that would have said that there was any criminal activity here taking place whatsoever. It simply is not illegal under the Concealed Carry Act to have a gun inside your home, including inside your apartment building. That is because the home is at the center of the Second Amendment. It is also at the heart of the Fourth Amendment. This is a place where a person may exercise their Second Amendment rights and a place where a person may protect themselves. And the officer observed nothing here at the time of the arrest or at the time of the recovery of the weapon to indicate otherwise that there was any illegal conduct. And for those reasons, again, the State has shown nothing in the fact findings here that was against the manifest weight of the evidence, and nor has the State shown that the trial court's finding was incorrect as a matter of law. Unless your honors have any other questions, I would rely on my brace for the rest of the argument. Thank you, Ms. Powell. Mr. Svalbard? Very briefly, your honors. First off, into the assertion of waiver and sandbagging. I would just like to point the court to the record that appears as to how this matter was litigated below. In the State's argument, in the State's hearing's argument, regarding the motion for corrective finding, as counsel is aware, we specifically pointed out the fact that not only was there no proof that the defendant lived there, there was actually proof that we had elicited on cross-examination of Officer Caribou that he lived in a different apartment building. And we asserted that based upon that, there was not a sufficient basis for the defendant to meet his burden of establishing an expectation of privacy. In response to that, defense counsel argued that he does go into the apartment door. He locks the door behind him. His girlfriend opens the door. That would be enough to establish that Thomas may be a resident of this building. Judge, at least at this point in the proceedings, we would suggest that we have met our initial burden and that we should be able to proceed to argument in total on this issue. The judge's response to that, your motion for corrective finding is respectfully denied. At this point, the petitioner has met its burden. The burden of production then shifts to the State, and we rest. Because we have no additional evidence to present, because we cannot present, we cannot prove a negative. We've already established through the cross-examination of Officer Caribou that the defendant does not live there. We have no other ability to prove whether or not he is there or not. And so we rest. And then in our argument – But your boss says you could have subpoenaed his girlfriend or whoever lived in that apartment. We could have, your Honor, but as you pointed out, Johnson makes it very clear and Rackus before that and all the other cases, that it is not our burden. It is never our burden to prove that. We have a burden of production, and we met our burden of production by proving that the defendant lives elsewhere. Undisputed evidence that the defendant lives elsewhere. And then in our argument as to why the motion should be denied, the Assistant State Attorney specifically argued yet again the defendant did not have standing, he had no privacy interest in the apartment building in which the gun was recovered. And then the judge makes no additional findings after that, other than the point in the midst of the argument that there's been no evidence to establish the defendant lives there. And so this notion of sandbagging, where it is not our burden to prove, when we put the defendant on notice that there is a serious question of his expectation of privacy, of his ability to prove it, we have no further obligation to do any of that because we can't prove. As I said, we can't prove a negative. What we can do is prove that he lives elsewhere. We can't prove how often he may stay there. We can't prove that it's actually his girlfriend. We don't even know, there's no reference anywhere in the paperwork who that woman might be. Just it's the police officer's belief that she may be the girlfriend. In regards to the Collins v. Virginia and other points of cases, this whole notion of the cartilage, I'd just like to point out that in all of those cases, the defendant was claiming that he had an expectation of privacy not only in the home, but also in the cartilage. And it was established in all of those cases that it was his home. In particular, the case the counsel mentioned so extensively, the Collins case. As she said, the U.S. Supreme Court recognized that the police officer had an implied license to go to the front door, but he stepped off of that implied license when he instead went to the driveway, lifted up the tarp over a covered motorcycle and looked at the VIN number to see if it was a stolen motorcycle, which is what he had suspected. And that was where the court found that the police officer violated the defendant's Fourth Amendment rights because he trespassed on the motorcycle itself. While on the Fourth Amendment property, he lifted the tarp and impeded the defendant's rights, implicated the defendant's Fourth Amendment rights. Here, as even Collins recognizes, the police officer has the implied license to enter into the cartilage and can see what he can see with his own eyes, which is what happened here. He can't go in and open up containers. He can't move things around. He didn't do that here. He followed them in. He saw the gun. He recovered it. And then finally, in regards to whether or not there was a Terry stab in this case, yes, the police officer was trying to conduct a Terry stab, but he was never successful in doing so. Because while he was following him into the building, no stab had ever occurred. The gun is dropped. It is abandoned. He recovers it. At that point, it's no longer simply a Terry stab. At that point, it's probable cause for an arrest. And that's what happened. And that's why the defendant was arrested in this case. And for all of these reasons and those in our briefs, we would ask this court to reverse the trial court's ruling and remand the matter for the proceedings. Thank you. Thank you. Thank you very much for your arguments here today, your excellent briefs. You've given us something to think about, and we will take the matter under advisement.